IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GREENS AT GREENCASTLE LIMITED PARTNERSHIP,** : : : **Plaintiff** : : **v.** : : **GREENCASTLE GIBG LLC,** : : **Defendant** : | **Civil Action No. 1:06-CV-1708** **(Chief Judge Kane)** |

## MEMORANDUM

Before the Court is Plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. No. 42.) This case concerns the applicability of certain land-use restrictions contained in the chain of title to a parcel of property once held by Plaintiff Greens at Greencastle Limited Partnership ("Greens") and now owned by Defendant Greencastle GIBG LLC ("GIBG"). Plaintiff Greens seeks injunctive relief preventing Defendant GIBG from developing the land in a manner inconsistent with the restrictions contained in the chain of title.

The Court has heard oral argument, all briefing is complete, and the motion is ripe for disposition. For the reasons that follow, Plaintiff Greens's motion for summary judgment will be granted.

### I.  BACKGROUND

*General information*

Plaintiff Greens is a limited partnership registered and with its principal place of business in the state of Maryland. (Doc. No. 43 ¶ 1.) Defendant GIBG is a Delaware limited liability company with its principal place of business in Connecticut. (Id. ¶ 2.) GIBG is the current owner of the real estate located in Antrim Township, Franklin County, Pennsylvania (the

"Property"), that is at the center of this dispute. (Id. ¶ 3.)

From a deed transfer in 1990, Plaintiff Greens became the owner of the Property and adjacent land in Franklin County; at the time, Greens was developing the adjacent land into residential houses for a golf course community. (Id. ¶ 4.) GIBG admits that the Property was owned by Greens at the time, but refuses to concede that the deeds attached as exhibits to the statement of facts establish that the adjacent land was owned or retained by Greens in 1990. (Doc. No. 45 ¶¶ 4; 6.) By deed dated December 7, 1990, Greens deeded the Property to Robert L. Elder and Diane S. Elder, husband and wife. (Doc. No. 43 ¶ 5.) The 1990 deed to the Elders contained a restrictive covenant, which was drafted at least in part by Daniel Sheedy, the owner of a corporation that was Greens's general partner. (Doc. No. 46-3 Ex. B, Deposition of Daniel Sheedy at 65:25-66:13 (hereinafter "Sheedy Dep.").) In particular, the Elder Deed restricted the use of the property to "the construction, operation and maintenance of one or more regulation eighteen (18) hole golf course facilities . . . and for . . . purposes incidental or related thereto . . . ." and provided that the property "shall be used for no other purpose" than those specified in the deed. (Doc. No. 43-2, Ex. A. at 122 (hereinafter "Elder Deed").) In addition, the Elder Deed prohibited any further subdivision of the property without Greens's consent. (Id.)

### *Financing for the golf course project*

As set out in the Elder Deed, contemporaneous with the transfer of property, the Elders arranged for a $1.5 million dollar loan from Citizen's National Bank of Southern Pennsylvania, which was secured by a first mortgage on the Property; the purpose of the loan was to provide funds for the golf course and related facilities. (Elder Deed at 123.) In August of 1991, after approval from Greens as required by the Elder Deed, the Elders refinanced their loan with

Hagerstown Trust Company in the amount of $2.4 million. (Sheedy Dep. at 116:22-117:7; Doc. No. 45-4 Ex. C.) This loan was also secured by a first mortgage on the Property, and contained a provision authorizing Hagerstown in the event of default to "sell the whole or, from time to time, any part of the Mortgaged Property at public auction or a private sale . . . on such terms as the Mortgagee in their uncontrolled discretion may determine . . . ." (Doc. No. 46-4 Ex. C, ¶ 6.02.)

The Elder Deed also contains a provision that is labeled "Lender's Exception." It generally provides that upon default of the mortgage, the Elder's lender may elect, in its sole discretion, to sell the property free of the primary restrictions set out in the deed. (Elder Deed at 123-24.) Notably, the Lender's Exception does not provide any procedure to conclusively demonstrate the lender's election to convey the property free of the restrictive covenants.

*Foreclosure*

In 1993, Hagerstown Trust instituted foreclosure proceedings against the Elders because of an event of default, as defined in the Hagerstown Mortgage, and caused it to be sold at a Sheriff's sale. (Doc. No. 46-5, Ex. D.) The statutory notice that the Property would be sold at the Sheriff's sale did not contain any reference to the restrictions set forth in the Elder Deed, and the bank's assistant vice president, Linda Mowen, did not recall any announcement at the sale that the property was subject to such restrictions. (Doc. No. 46-6 Ex. E; Doc. No. 46-8, Ex. G, Deposition of Linda Mowen at 59:10-15 (hereinafter "Mowen Dep.").) On January 31, 1996, Greencastle Links, LP, became the deed owner of the Property after purchasing it at the auction for $1.5 million dollars. (Doc. No. 43 ¶ 8.)

*Transferring of the property*

On February 18, 1998, Greencastle Links, LP, deeded the Property to Greencastle Golf

Club Limited Partnership, and then on July 1, 2005, Greencastle Golf Club LP conveyed the Property by deed to Defendant GIBG. (Id. ¶¶ 9-10.) The GIBG deed provided that the "conveyance is made subject to the restrictions and conditions contained in the deeds forming the chain of title to the above described property." (Id. ¶ 11.) GIBG intends to subdivide the Property and develop it for the sale of residential homes and has filed a plan with Antrim Township to accomplish this goal. (Id. ¶ 12.)

## II. STANDARD OF REVIEW

Plaintiff Greens has moved for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal

4

memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

### III. DISCUSSION

Plaintiff Greens's argument in favor of summary judgment is fairly straightforward: The restrictions in the Elder Deed are valid and run with the land. The restrictions were not discharged, negated, or made unenforceable by any subsequent event (such as the Lender's Exception). The restrictions continue to provide a substantial benefit to the people for whom it was created—Greens and the homeowners of the adjacent properties developed by Greens—and should be enforced against any purchaser of the Property.

In response, Defendant GIBG argues that: (1) the restrictive covenant is no longer in force, either because the Lender's Exception automatically extinguished the alleged restrictions in the Elder Deed when Hagerstown Bank foreclosed on the Property, or is otherwise unenforceable because the Lender's Exception is ambiguous; and (2) even if the restrictive

5

covenant is in force the deed allows GIBG to frustrate the benefit of the restrictions simply by shutting down the golf course and the Court should therefore discharge the restrictions. The Court will consider these contentions as argued by the parties.

**A. Restrictive Covenants**

The Pennsylvania Supreme Court has defined a restrictive covenant as "a private agreement, usually in a deed or lease, that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." Vernon Tp. Volunteer Fire Dept. Inc. v. Connor, 855 A.2d 873, 875 (Pa. 2004) (citing Blacks Law Dictionary 371 (7th ed. 1999)).[1] While a landowner in Pennsylvania may limit his or her right to use property by agreement or contract, these restrictive covenants are disfavored because they interfere with the free use and enjoyment of property. Id., at 879 (Pa. 2004) (citing Lustig v. Facciolo, 188 A.2d 741, 743 (1963)). Accordingly, though they are legally enforceable, restrictive covenants are strictly construed. Id. Restrictive covenants that "run with the land" bind subsequent owners of the property, and property purchasers have a duty to become aware of recorded restrictions in the chain of title even absent actual notice. See Juniata Valley Bank v. Martin Oil Co., 736 A.2d 650, 663 (Pa. Super. Ct. 1999); Vernon Tp., 855 A.2d at 880.[2]

---

[1] As the Property is located in Pennsylvania, there does not appear to be any dispute that Pennsylvania law applies to this action.

[2] In this case, as described above, the Property has been transferred several times since the purchase by the Elders, once by foreclosure and subsequent sheriff sale. (Doc. No. 43 ¶ 8.) There does not appear to be a dispute for purposes of the present motion, however, that the restrictions set out in the Elder Deed were intended to run with the land and were included in the Property's chain of title, providing constructive notice to subsequent purchasers. Additionally, though questions regarding the effect of the sheriff sale on the restrictions were raised at oral argument and subsequently briefed, Defendant GIBG has represented that this was merely an attempt to shift the Court's focus away from Defendant's arguments:

**B. Lender's Exception**

As discussed above, the parties mainly dispute the meaning of the Lender's Exception provided in the "Conditions and Restrictions" section of the Elder Deed. Plaintiff Greens argues that the Lender's Exception provided in the Elder Deed is not applicable and did not extinguish the restrictive covenant because the lender, Hagerstown Trust, did not elect to utilize the provision to convey the property free of the deed's restrictions. (Doc. No. 44 at 17-18.) Defendant GIBG argues, based on the language of the Lender's Exception and inferences to be drawn from the rest of the deed, that it has the unfettered right to develop the Property because Hagerstown Trust "convey[ed] the Property without the alleged deed restriction by instituting foreclosure proceedings if the Elders defaulted on their loan." (Doc. No. 47 at 14.) GIBG asserts that the Lender's Exception did not require Hagerstown Trust to perform any act other than the institution of foreclosure proceedings to pass the title free of the restrictive covenants in the Elder Deed. (Id. at 15.)

Both parties seem to agree that the provision at issue is essentially contractual and have framed the issue around certain well-settled principles of contract interpretation. (Doc. No. 48 at 11; Doc. No. 47 at 11.) "The primary object in the interpretation of any written instrument is to ascertain and effectuate the intention of the parties." Hess v. Jones, 7 A.2d 299, 300 (Pa. 1939); see also Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir. 1999). In Pennsylvania, the intent of the

---

Defendant is not arguing that the restriction was discharged via the law of Sheriff's Sales or divestiture of liens and encumbrances. Instead, Defendant's position is that the election to institute foreclosure proceedings, resulting in the lender's taking of title to the Property, constituted the necessary election under the provisions of the Elder Deed.

(Doc. No. 61 at 8.)

parties to a written contract is typically ascertained from the writing itself. Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92-93 (3d Cir. 2001) (citing Steuart v. McChesney, 444 A.2d 659, 651 (Pa. 1982)). In considering the writing, a court cannot assume that the parties carelessly chose a contract's language or that they "were ignorant of the meaning of the language they employed." Murphy v. Duquesne University of the Holy Ghost, 777 A.2d 418, 429 (Pa. 2001).

If an agreement is ambiguous, the meaning must be interpreted by the factfinder considering the relevant external evidence. See In re Shenango Group Inc., 501 F.3d 338, 347 (3rd Cir. 2007). A patent ambiguity will appear on the face of the instrument from the use of defective, obscure, or insensible language, while a latent ambiguity will arise from "extraneous or collateral facts which make the meaning of the written agreement uncertain although the language . . . appears clear and unambiguous." Bohler-Uddeholm, 247 F.3d at 93; see also Allegheny Intern Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1425 (3d Cir. 1994)). Because it is presumed that the written instrument conveys the parties' intent,

> a contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995) (quoting Samuel Rappaport Family Partnership v. Meridian Bank, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1993). To assess whether a contract is ambiguous, "the court may consider 'the words of the

8

contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" Bohler-Uddeholm, 247 F.3d at 93. A court must not "rely upon a strained contrivancy to establish [an ambiguity] . . . . [E]ach party's proffered interpretation must be reasonable, in that there must be evidence in the contract to support the interpretation beyond the party's mere claim of ambiguity . . . ." Id. at 93-94. Additionally, a proffered interpretation is not reasonable if it contradicts the common understanding of a disputed term when there is another term the parties could easily have used to convey the proposed contradictory meaning. Id. at 94.

The Lender's Exception in the Elder Deed provides, in pertinent part:

> In the event of a default under the first mortgage, or under any substitute arrangement for permanent financing approved by Grantor, lender, in its sole discretion, may elect to convey the Property free of the restrictions set forth in paragraphs 1, 2, 3, and 4 of these restrictions, which restrictions shall thereafter be of no force or effect as to the property herein conveyed, as of the time of vesting of title in the lender or any grantee of the lender taking title through foreclosure or proceedings instituted for the purpose of realizing on the property as collateral for the loan or for the purpose of collecting the indebtedness owing from Grantee to Lender. However, in the event of such vesting of title in the Lender or any other party pursuant to such foreclosure or collection proceedings, the property shall be and is hereby made subject to the restrictive covenants which are now or hereafter imposed and existing as to the residential subdivision and development contemplated by the Grantor as to the remaining lands of the Grantor contiguous to the Property, it being the intent of the Grantor that if the Property shall be sold and these restrictions shall, by virtue of the provisions of this paragraph, become inapplicable to the Property, the Property shall thereafter be subject to the same restrictions as are applicable to the surrounding residential subdivision as developed by the Grantor, its successors or assigns.

(Elder Deed at 123-24.) After reviewing the language of the deed in its entirety and considering the interpretation principles discussed above, the Court finds that GIBG's proposed

9

interpretation is unpersuasive.  It is clear that the Lender's Exception provides two prerequisite steps to the discharge of the deed restrictions: (1) a default on the Elders' mortgage, and (2) an election by the lender to convey the Property free of the restrictions contained in the deed.  In the absence of either of these two conditions, the restrictions were to remain in place and run with the land.  The election requirement is contained in one sentence of the Lender's Exception that provides: "lender, in its sole discretion, may elect to convey the Property free of the restrictions set forth in paragraphs 1, 2, 3, and 4 of these restrictions, which restrictions shall thereafter be of no force or effect as to the property herein conveyed, as of the time of vesting of title in the lender or any grantee of the lender taking title through foreclosure or proceedings instituted for the purpose of realizing on the property as collateral for the loan or for the purpose of collecting the indebtedness owing from Grantee to Lender." (Elder Deed at 123.)  Foreclosure is mentioned, but there is no indication from the plain language of this provision that foreclosure was intended to automatically demonstrate the lender's election to convey the Property free of restrictions.  The Court also does not find persuasive support for such an interpretation in the remainder of the Lender's Election or in any other section of the Elder Deed.

GIBG tries to find support for its interpretation from inference; it points out that specific affirmative obligations—such as notice filing requirements with the land records office—are explicitly provided in other sections of the deed and argues that the absence of such affirmative requirements in the Lender's Exception shows that "the parties intended for an event of default and subsequent foreclosure proceeding to serve as the lender's election to convey the Property without any alleged deed restriction." (Doc. No. 47 at 16.)  The Court is not persuaded by this argument.  As Greens points out, "elect" in this context means to select, choose, or decide.  <u>See</u>

e.g., The American Heritage Dictionary 574 (4th ed. 2006).  Nothing in the Elder Deed can reasonably be read as providing that the institution of foreclosure proceedings necessarily demonstrated an election by the lender to convey the property free of restrictions.  Indeed, it would have been possible and relatively simple for the Elder Deed parties to provide that some affirmative action, such as institution of foreclosure proceedings, automatically demonstrated the lender's election to convey the Property free of the restrictions; they did not.  The presence of specific affirmative requirements provided in other sections of the deed actually more convincingly evidences the intention of the parties to not provide such a conclusive procedure.

GIBG next argues that even if the Court rejects its proffered interpretation, summary judgment is still inappropriate: "if the Court determines that, based on the language itself, the Lender's Exception is unclear as to how a lender would exercise its right to convey the Property without any alleged restriction, then the Court must construe that ambiguity against the Plaintiff and in favor of Defendant."  (Doc. No. 47 at 17.)  The Court must reject this argument as well; it is not clear that the Lender's Exception is ambiguous in this respect.  As discussed above, the word "elect" has a plain meaning, the provision is very clear that the lender's election is required to dissolve the land use restrictions, and nothing on the face of the deed contradicts this requirement.  GIBG has also not submitted any extrinsic evidence that the parties had a different understanding or confusion over the phrase "to elect" or the procedures required to manifest an election such that would evidence a latent ambiguity in the provision.  The court cannot assume that the parties carelessly chose a contract's language, and as the Plaintiff has argued, lack of a specified procedure for exercise of the Lender's Exception does not necessarily connote "confusion or uncertainty about the parties' intent."  (Doc. No. 48 at 14.)  As such, the Court is

11

not persuaded that the lack of a specific procedure to manifest the lender's election renders the provision fatally ambiguous under these circumstances.

Given the clear meaning of the Lender's Exception, the issue is whether GIBG has pointed to sufficient evidence in the record to show that Hagerstown Trust chose to exercise the election under the provision. Greens argues that, even though the discovery period was extended to explore the issue, no documents or testimony have been offered to show that Hagerstown Trust attempted or intended to exercise its election under the Lender's Exception. (Doc. No. 48 at 13, 15.) It is clear from GIBG's brief and responses at oral argument that they rely solely on the deposition testimony of Linda Mowen and the institution of foreclosure proceedings to demonstrate Hagerstown Trust's election. (Doc. No. 47 at 15.)

The Court finds that the evidence in the record is not sufficient to demonstrate an election by Hagerstown Trust to remove the restrictions in the Elder Deed. It is true that Hagerstown Trust's choice to foreclose, though not conclusive under the terms of the Elder Deed, is also not irrelevant on the issue of election. Upon the Elders' default on the mortgage, Hagerstown Trust had numerous options at its disposal under both the provisions of its mortgage and Pennsylvania law, such as foreclosure, taking possession of the Property, or even renegotiating the mortgage to avoid a further default; foreclosure was therefore not the automatic result of the Elders' default. (See Doc. No. 46-4 Ex. C, ¶ 6.02.) As GIBG argues, foreclosure is a proceeding instituted for the purpose of collecting the remaining debt on the mortgage and it is clear from the record that Hagerstown Trust chose to foreclose to recover collateral value of the Property because it was not generating sufficient revenue under the Elders to sustain the mortgage. (See Doc. No. 46-5.) But, there is no indication in the record that Hagerstown Trust sought to or even contemplated

12

exercising its option under the Elder Deed in connection with this foreclosure. Hagerstown Trust's Assistant Vice President testified at her deposition that she did not know whether or not the lender attempted or intended to elect to remove the restrictions. (Mowen Dep. at 71:1-18.) It is true that the notice of sheriff's sale did not contain any reference to the alleged restrictions in the Elder Deed even though the same notice mentioned restrictions on another property being sold, but Pennsylvania rules governing the sheriff's notice do not require inclusion of such restrictions. See Pa. R. Civ. P. 3192.2(b)(1) (requiring that sheriff's notice include "a brief description of the property to be sold, its location, any improvements, the judgment of the court on which the sale is being held, the name of the owner or reputed owner, and the time and place of sale . . . ."). Further, there is no indication from the record that the use restrictions were omitted from the sheriff's notice because of any action of Hagerstown Trust. GIBG does not offer any other evidence to suggest Hagerstown Trust attempted or even intended to elect to convey the property without land use restrictions, and, even considering this evidence in the light most favorable to GIBG, the Court finds that there is no genuine issue of material fact on this issue. As such, the restrictions were not removed by exercise of the Lender's Exception and remain running with the land.

### C. Discharge of the Land Use Restrictions

Lastly, GIBG argues that the Court should refuse to enforce the land use restrictions because they do not provide any benefit to the Greens. (Doc. No. 47 at 20.) In support of this argument, GIBG points out that the Elder Deed does not technically require the Property owner to maintain an active golf course because it provides only that the Property "may" be used for golf course facilities. (Id.) Greens concedes that the owner of the Property is not required to

operate a golf course, but counters that the Elder Deed also explicitly provides that the Property may be used for no other purpose and shall not be further subdivided. (Doc. No. 48 at 17.) Given this use restriction, Greens argues that, even if the golf course were shut down, there is still substantial benefit provided by the Elder Deed restrictions, including open space and the remaining limitations on other potentially undesirable uses. (Doc. No. 48 at 17.)

Because land use restrictions are not favored under Pennsylvania law, "land shall not be burdened with permanent or long-continued restrictions which have ceased to be of any advantage." Vernon Tp. Volunteer Fire Dept., Inc. v. Connor, 855 A.2d 873, 880 (Pa. 2004) (quoting Daniels v. Notor, 133 A.2d 520, 523 (1957)); see also Katzman v. Anderson, 59 A.2d 85, 87 (Pa. 1948) ("Nor will equity grant injunctive relief if the enforcement of a restriction would make the land unfit or unprofitable for use and development, or result in a far greater hardship to the servient than a benefit to the dominant tenement."). The burden is on the party seeking to discharge the restriction "to show that the original purpose of the restriction has been materially altered or destroyed by changed conditions, and that substantial benefit no longer extends to Appellants by enforcement of the restriction." Vernon Tp., 855 A.2d at 880. The benefit to the party trying to enforce the restriction must be in the physical use or enjoyment of the land possessed by him. Schulman v. Serrill, 246 A.2d 643, 647 (Pa. 1968). But, the restrictions can cover a broad range of activities and uses. See Loeb v. Watkins, 240 A.2d 513, 516 (Pa. 1968) ("If a covenant running with land proclaims that a lake ornamenting the land must never be destroyed, no successor in title would have the right to argue that the lake is not pretty, the water muddy and no good for fishing, and, therefore, should be drained. Where a man's land is concerned, he may impose, in so far as the imposition does not violate any law or

14

public policy, any restriction he pleases.").

The Court must reject GIBG's argument. There has been no argument that the Elder Deed's restrictions are unenforceable as a violation of another law or public policy, and there is simply not sufficient evidence in the record that some change or circumstance has undermined the advantage of the restrictions. In fact, it appears that, as of the time of briefing, GIBG was operating a golf course on the Property, so Greens has been actively receiving the intended benefit from the restrictions. (Doc. Nos. 47 at 20, 48 at 16.) The hypothetical situation that GIBG proposes—essentially that it may shut down the golf course "for economic and other reasons" thereby depriving Greens of any benefit—is unpersuasive. To deprive Greens, GIBG would have to both shut down the golf course and also retain the vacant Property, which can be used for no other purpose. GIBG has cited to no authority suggesting that such a speculative possibility should even be considered, let alone be determinative, in assessing the continued benefit of the restrictions. See Loeb, 240 A.2d at 517 (O'Brien, J.) (concurring) ("The mere possibility of change does not render enforcement of the covenant useless."). GIBG has also pointed to no evidence in the record suggesting that the restrictions render the land economically worthless or that the restrictions result in a far greater hardship to GIBG than a benefit to Greens. See Schulman, 246 A.2d at 648. Additionally, as Greens has argued, even absent an operating golf course, the restrictions still maintain open space and limit the density of residential development, see Scott v. Owings, 302 A.2d 423, 425 (Pa. Super. Ct. 1973), advantages explicitly anticipated in the Elder Deed's separate restriction on further subdivision of the Property. Considering the above, and other arguments made by Greens, the Court finds that GIBG's contention is unpersuasive; the benefits of these restrictions are not illusory.

Accordingly, the Court finds that there is no genuine issue of material fact as to whether Greens will derive the intended benefit and advantages of the Elder Deed's restrictions.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff Greens's motion for summary judgment. An order consistent with this memorandum will follow.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GREENS AT GREENCASTLE LIMITED PARTNERSHIP,** : : : Plaintiff : : v. : : **GREENCASTLE GIBG LLC,** : : Defendant : | Civil Action No. 1:06-CV-1708 (Chief Judge Kane) |

### ORDER

**AND NOW** this 28th day of September, 2009, upon consideration of Plaintiff's motion for summary judgment (Doc. No. 42), and for the reasons set forth in the Court's memorandum opinion filed herewith, **IT IS HEREBY ORDERED** that Plaintiff's motion is **GRANTED** as follows:

1. Defendant Greencastle GIBG LLC, is permanently enjoined from developing or using the subject property in any manner contrary to the deed restrictions contained in the deed attached as exhibit "A," to Plaintiff's amended complaint and recorded at Franklin County Deed Book Volume 1102, Page 114.

2. The Clerk of Court is directed to enter judgment in favor of the Plaintiff and against the Defendant and to close the file.

    S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania